UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JENNIFER C. WATKINS,           :
                               :CIVIL ACTION NO. 3:16-CV-367
          Plaintiff,           :
                               :(JUDGE CONABOY)
          v.                   :
                               :
CAROLYN W. COLVIN,             :
Acting Commissioner of         :
Social Security,               :
                               :
          Defendant.           :
                               :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  (Doc. 1.)  She alleged disability beginning on February 21, 2013.  (R. 14.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Michelle Wolfe, concluded in her May 14, 2014, decision that Plaintiff's severe impairment of fibromyalgia did not meet or  equal the listings.  (R. 13, 16, 20.)  She also found that Plaintiff had the residual functional capacity ("RFC") to perform light work with certain nonexertional limitations and that she was capable of performing her past relevant work as a secretary.  (R. 22-25.)  ALJ Wolfe therefore found Plaintiff was not disabled.  (R. 26.)

With this action, Plaintiff asserts that benefits should be awarded for the following reasons: 1) the ALJ's rejection of Plaintiff's treating physician's opinion was not supported by substantial evidence; 2) the ALJ's determination that Plaintiff was

not fully credible was not supported by substantial evidence; and 3) the ALJ erred in the determination that Plaintiff had engaged in substantial gainful activity February through April 2013.  (Doc. 11 at 5.)  After careful review of the record and the parties' filings, I conclude this case is properly remanded for further consideration.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for DIB on May 6, 2013.  (R. 13.) The claims were initially denied on June 18, 2013, and Plaintiff filed a request for a hearing before an ALJ on July 2, 2013.  (*Id.*)

ALJ Wolfe held a video hearing on July 14, 2014.  (*Id.*) Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Carmine Abraham.  (*Id.*)  As noted above, the ALJ issued her unfavorable decision on June 25, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 26.)

Plaintiff's request for review of the ALJ's decision was dated September 4, 2014.  (R. 1.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on January 11, 2016.  (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On March 1, 2016, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant

2

filed her answer and the Social Security Administration transcript on May 4, 2016.  (Docs. 9, 10.)  Plaintiff filed her supporting brief on June 17, 2016 (Doc. 11), and  Defendant filed her brief on July 14, 2016 (Doc. 12).  Plaintiff did not file a reply brief and the time for doing so has passed.  Therefore, this matter is fully briefed and ripe for disposition.

**B.**   ***Factual Background***

Plaintiff was born in 1977 and was thirty-six years old on the alleged disability onset date.  (Doc. 11 at 1; Doc. 12 at 3.)  She lived with her husband and son at the time of the hearing.  (Doc. 11 at 1.)  Plaintiff completed two years of college and, from 2005 to 2013, she worked as a secretary.  (Doc. 11 at 1-2; Doc. 12 at 3.)

**1.**   **Impairment Evidence**

Plaintiff was treated at Family Practice Center, P.C., by Thomas Wallace, M.D., a primary care physician, and Jamie Ficks, CRNP, since January 2012.  (R. 216.)  On January 11, 2012, Dr. Wallace noted she had diabetes, elevated liver enzymes, elbow pain, and hyperlipidemia.  (*Id.*)

In a note from December 6, 2012, Dr. Wallace stated "musculoskeletal exam reveals multiple trigger points consistent with fibromyalgia."  (R. 230.)  His diagnoses included fibromyalgia for which he prescribed clyclobenzaprine, and he noted that he talked to Plaintiff about the associated risk of sleepiness.  (*Id.*)

He also noted that Plaintiff would soon be seeing a rheumatologist because of her arm pain.  (*Id.*)

On January 28, 2013, Dr. Wallace reported that Plaintiff was "exquisitely tender" over the greater trochanter, and he administered a steroid injection into her left hip.  (R. 231.) His office note indicates that Plaintiff complained of pain in her left groin, swelling of her fingers and knees cracking.  (R. 232.) Objective observation/examination showed that Plaintiff had cracking of her knees with some associate thigh and hamstring pain, several trigger points consistent with fibromyalgia, and a positive Lachman test.  (*Id.*)  He noted that he believed "she has some fibromyalgia" and he prescribed Cymbalta.  (*Id.*)

On February 5, 2013, Dr. Wallace saw Plaintiff because of problems she experienced after starting Cymbalta.  (R. 233.)  He noted that Plaintiff had multiple symptoms, including considerable pain in her left leg, and the trochanteric shot really did not help.  (*Id.*)  Dr. Wallace stated unequivocally that Plaintiff had fibromyalgia and examination revealed multiple trigger points. (*Id.*)  He started her on Tramadol, advising her of the risk of seizures.  (*Id.*)

At a follow-up appointment on February 8, 2013, Plaintiff presented with multiple symptoms, some of which Dr. Wallace thought could be related to Tramadol so he discontinued it.  (R. 234.)  He found that Plaintiff had fibromyalgia tenderness and noted that he

4

did not think she could work.  (*Id.*)

On February 12, 2013, Plaintiff reported quite a bit of pain through her body and musculoskeletal exam showed multiple triggerpoints.  (R. 236.)  Dr. Wallace reported that Plaintiff had "severe fibromyalgia" and planned to increase her dosage of Gabapentin.  (*Id.*)  He noted that Plaintiff was unable to work and he planned to see her again in one week or sooner if needed.  (R. 237.)

At her February 19, 2013, follow up, Plaintiff reported that she was experiencing dizzy spells and the Gabapentin was helping somewhat but she could not sit in the car or a chair for a while without it hurting.  (R. 238.)  Examination showed multiple pressure points consistent with fibromyalgia.  (R. 238.)  Dr. Wallace noted that there was "no way she could work right now, certainly not full time and maybe not even four hours a day." (*Id.*)  He added that Plaintiff reported she had sleep disturbance and she was getting somewhat depressed.  (*Id.*)  Dr. Wallace planned to continue the Gabapentin for the fibromyalgia and consider increasing it in the future.  (*Id.*)  He again planned to see her in a week or sooner if needed.  (*Id.*)  The following week, Plaintiff reported nausea, fatigue and soft tissue pain which Dr. Wallace believed to be fibromyalgia.  (R. 240.)  He noted that Plaintiff said she could only work for four hours per day and she was scheduled to see a rheumatologist in April.  (*Id.*)  Examination

revealed multiple trigger points.  (*Id.*)  Dr. Wallace believed the fatigue was due to fibromyalgia, adding that he needed to be vigilant for other etiologies.  (*Id.*)  He also noted that Plaintiff was not working and she would continue with her work restriction to four hours per day.  (R. 240-41.)

On March 12, 2013, Plaintiff complained of a lot of pain and burning, fatigue, anxiety, and stress.  (R. 242.)  Dr. Wallace planned to increase the Gabapentin dosage.  (*Id.*)

On April 2, 2013, Plaintiff saw a rheumatologist, Keith N. Shenberger, M.D.  (R. 196.)  He confirmed that she continued to have symptoms of fibromyalgia and significant myofascial pain. (*Id.*)  He noted that she was on a high does of Gabapentin which she was tolerating well.  (*Id.*)  Dr. Shenberger noted that either Cymbalta or Savella could be added to her medication regimen but Sertraline would have to be stopped.  (*Id.*)

On April 3, 2013, Plaintiff reported that she was tolerating the four-hour workday fairly well but it was difficult.  (R. 243.) She again was found to have some trigger points on examination. (*Id.*)  Dr. Wallace noted that Plaintiff's fibromyalgia was stable on Gabapentin and he would move her up to five hours of work per day.  (*Id.*)  One week later, Plaintiff returned to Dr. Wallace reporting she was unable to work--she was having a difficult time with pain and swelling in her arms due to fibromyalgia.  (R. 244.) Dr. Wallace believed it was fibromyalgia pain but wanted to "rule

6

out something rare such as bone marrow disease." (*Id.*)  He added Celebrex to her medication regimen and noted that Plaintiff was unable to work, adding that he would give her a note. (*Id.*)  On April 25, 2013, Plaintiff continued to have chronic pain and Dr. Wallace continued her medication regimen.  (R. 245.)  She reported that she could not stand for any length of time but she thought she could do her sitting job for four hours a day.  (*Id.*)

On May 28, 2013, Dr. Wallace noted "patient is feeling poorly today.  She is very, very tired and very, very sore. . . . They let her go from her job because they had nothing to offer her that could be done with just four hours a day of work."  (R. 246.)  Dr. Wallace noted that Plaintiff was collecting unemployment and was applying for disability.  (*Id.*)  He found that Plaintiff had "exquisite trigger point tenderness positive for fibromyalgia" and planned to start her on Sertraline.  (*Id.*)

On July 9, 2013, Plaintiff reported to Dr. Wallace that she had good days and bad days with her fibromyalgia and she had pain all over.  (R. 335.)  Examination showed that Plaintiff walked with a normal gait but she had stiffness in her legs and cracking of her bones.  (R. 336.)  Dr. Wallace continued her medication regimen. (R. 337.)  An August 30, 2013, examination showed that Plaintiff had multiple trigger points consistent with fibromyalgia.  (R. 339.)  He noted that she was to follow up with a specialist.  (*Id.*)

On September 18, 2013, Plaintiff again saw Dr. Shenberger.

(R. 309.)  He noted that Dr. Wallace had diagnosed Plaintiff with fibromyalgia in February 2013, but Plaintiff had experienced symptoms for a year previously.  (*Id.*)  She reported that she was sore and tender all over and she could go three or four days feeling great and then sometimes had pain for a week.  (*Id.*) Physical examination showed that Plaintiff was very tender at all musculoskeletal sites and that she was tender on palpation globally with reduced strength secondary to tenderness.  (R. 311.)  Dr. Shenberger recorded that he did not find Plaintiff's fibromyalgia to be much better and maybe a medication change should be considered as well as exercises that help reduce pain.  (*Id.*)

On October 4, 2013, Dr. Wallace recorded that he reviewed the rheumatology consultation and he increased her flexeril dosage. (R. 340.)  Plaintiff reported she was having a good day.  (*Id.*)

On January 7, 2014, Plaintiff denied musculoskeletal symptoms. (R. 344.)  On January 10, 2014, no fibromyalgia related problems were reported or recorded.  (R. 348.)  At both of these visits, problems related to diabetes were the focus.  (R. 345, 347.)

On February 10, 2014, Plaintiff reported a fibromyalgia flareup which she thought could be related to increased activity-- shoveling and running the snowblower, plus going to the gym three times a week. (R. 350.)  Musculoskeletal and extremity examination was normal.  (R. 351.)  Dr. Wallace urged Plaintiff to rest when she had a flare up and do less weight and more repetitions with her

8

exercises to lessen muscle strain.  (*Id.*)

On March 11, 2014, Dr. Wallace noted that Plaintiff reported a three-day fibromyalgia flareup and Tramadol did not help control the pain.  (R. 353.)  Plaintiff requested something stronger for the pain.  (*Id.*)  No problems were recorded on examination.  (R. 354.)  Dr. Wallace added hydrocodone/acetaminophen to her medication regimen.  (R. 355.)

On April 1, 2014, Plaintiff reported increased fibromyalgia pain and increased depression.  (R. 356.)  She felt the Gabapentin was no longer working.  (*Id.*)  Plaintiff presented disability forms to be filled out and noted she planned to return to see Dr. Shenberger.  (Id.)  No abnormalities were noted in physical examination findings.  (R. 357.)  At the time of her visit, CRNP Ficks noted concern over the number of medications Plaintiff was taking for her fibromyalgia--hydrocodone/acetaminophen, Tramadol, Celebrex, Gabapentin, and Flexeril .  (R. 358.)  CRNP Ficks stated that she would refer Plaintiff to pain management if her pain continued to be as bad as it was then and Dr. Shenberger was unable to help her.  (*Id.*)

Plaintiff was seen for follow up of depression and fibromyalgia on May 1, 2014.  (R. 360.)  She reported that Lyrica had not helped much to control the pain or depression symptoms and she was not able to do her regular daily activities when her fibromyalgia was bad and this frustrated her.  (360.)  No

9

abnormalities were noted in physical examination findings.  (R. 361.)  CRNP Ficks discussed with Plaintiff that she could work but she had limitations and that getting out of the house would probably help her depression symptoms.  (R. 362.)  Plaintiff agreed to start looking for a job that she was able to adapt to her lifestyle.  (*Id.*)  CRNP Ficks also noted that she referred Plaintiff to pain management for evaluation and intervention regarding her chronic pain and fibromyalgia.  (*Id.*)

**2.   Opinion Evidence**

On April 1, 2014, CRNP Ficks completed a Physical Capacity Evaluation indicating that Plaintiff would be able to work with restrictions.  (R. 333.)  She opined that Plaintiff could lift up to twenty pounds, she could stand, walk and sit for an hour or less (cumulative in an eight-hour day), she had to avoid repetitive pushing and pulling repetitive hand motions, she had to avoid squatting, climbing, twisting, carrying, pushing and pulling, she would require unscheduled breaks during an eight-hour workday, and she would likely be absent from work more than two days per month. (*Id.*)  On July 11, 2014, Dr. Wallace signed the Evaluation, noting "Agreed."  (R. 365.)

**3.   Hearing Testimony**

Plaintiff testified that she may be able to work some but the problem was dependability, that she has good days and bad days which she cannot predict.  (R. 65-66.)  She stated that she has

10

pain daily but on bad days it is hard to move and she cannot function fully.  (R. 66.)  She stated she had about two to three bad days per week and she exercises when she feels good.  (R. 67-68.)  Plaintiff also testified that she takes Vicodin (which makes her sleepy) on bad days and with the medication her pain ranges from three to six on a scale of zero to ten.  (R. 73.)  On bad days, Plaintiff said she sleeps for five to ten hours and on a good day she naps for an hour due to fatigue.  (R. 74.)

Plaintiff said that she shops but uses a motorized cart if it's a bad day and that she has trouble sitting, walking, or standing on the bad days.  (R. 69.)  Plaintiff testified that she engages in many activities on her good days but added that she sometimes overdoes it on those days and feels it later.  (R. 70-71, 73.)  For this reason, Plaintiff said she limits her activity even on good days.  (R. 73.)

When asked about her previous work as a secretary at Environmental Solutions, she explained that her employer wanted her to be full time and she was unable to work that much so she left on medical leave and collected unemployment.  (R. 71.)  She said she thought she could have worked full time if her employer gave her time to get used to it but she would not necessarily have been dependable because she would miss days due to flare ups.  (*Id.*) Plaintiff added that toward the end of her employment her attendance slipped: she was taking off work for a week or two at a

11

time and took extra breaks.  (R. 72.)

Regarding unemployment compensation, she reported that she collected for twenty-six weeks and, although she believed she could have gotten an extension, she did not do so because she was not able to look for work anymore because of the dependability problem. (*Id.*)  Plaintiff said she liked to work, she had been doing so for twenty years before the fibromyalgia problem, and was unhappy about her current situation.  (R. 74.)

The ALJ asked the VE to consider an individual of the same age, education and work experience as Plaintiff who had the residual functional capacity to perform work at a light exertional level . . . but subject to the following limitations: the individual could occasionally stoop, crouch, crawl, kneel and climb, but never on ladders, ropes or scaffolds and she would need to avoid concentrated exposure to vibrations and hazards.  (R. 76.) The VE testified that such an individual would be able to do the secretary position even if that individual required the option to transfer positions throughout the workday but would not be off task while transferring, and could sit and stand per each interval one hour throughout the workday.  (R. 76-77.)  The VE also testified that all jobs would be eliminated if the individual required additional breaks throughout the workday and, as a result, would be off task more than twenty percent of the day, and the same would be true if the individual would be consistently absent from work two

12

or more days per month.  (R. 79.)

**4.   ALJ Decsion**

As noted above, ALJ Wolfe issued her decision on July 25, 2014.  (R. 13-26.)  She made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant meets the insured status requirement of the Social Security Act through December 31, 2017.
>
> 2.   The claimant had alleged disability since February 21,` 2013, but engaged in substantial gainful activity during the following periods: February 2013 through April 18, 2013 (20 CFR 404.1520(b) and 404.1571 et seq.).
>
> 3.   However, there has been a continuous 12-month period(s) during which claimant did not engage in substantial gainful activity.  The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.
>
> 4.   The claimant has the following severe impairment: fibromyalgia (20 CFR 404.1520(c)).
>
> 5.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 6.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally stoop, crouch, crawl, kneel and climb, but never on ladders, ropes or

scaffolds.  She is able to occasionally
push/pull with the upper and lower
extremities, and perform occasional
overhead reaching.  She must avoid
concentrated exposure to vibrations and
hazards including moving machinery and
unprotected heights.  The claimant
should have the option to transfer
position from sit/stand, will not be off
task while transferring, and can sit and
stand per each interval one hour
throughout the workday.

7.   The claimant is capable of performing
past relevant work as a secretary.  This
work does not require the performance of
work-related activities precluded by the
claimant's residual functional capacity
(20 CFR 404.1565).

8.   The claimant has not been under a
disability, as defined in the Social
Security Act, from February 21, 2013,
through the date of this decision (20
CFR 404.1520(f)).

(R. 15-26.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[1]  It is necessary for the

---

[1]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

only if his physical or mental impairment or
impairments are of such severity that he is not
only unable to do his previous work but cannot,
considering his age, education, and work
experience, engage in any other kind of

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant

---

> substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step four of the sequential evaluation process when the ALJ found that Plaintiff could perform her past relevant work as a secretary.  (R. 25.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing

16

> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.*

*Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not

18

precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision was error and benefits should be awarded for the following reasons: 1) the ALJ's rejection of Plaintiff's treating physician's opinion was not supported by substantial evidence; 2) the ALJ's determination that Plaintiff was not fully credible was not supported by substantial evidence; and 3) the ALJ erred in the determination that Plaintiff had engaged in substantial gainful activity February through April 2013. (Doc. 11 at 5.)

Before addressing Plaintiff's specific errors, an overview of considerations relevant to determining whether a claimant is disabled due to fibromyalgia is appropriate. As many courts have recognized, the Court of Appeals for the Seventh Circuit set out the unique nature of disability claims based on fibromyalgia in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996). *See, e.g.*, *Smith v. Comm'r of Soc. Sec.*, Civ. A. No. 09-182, 2009 WL 2762687, at *3 (W.D. Pa. Aug. 31, 2009). *Sarchet* explained that fibromyalgia is

a common, but elusive and mysterious, disease

19

> . . . . Its cause, or causes are unknown,
> there is no cure, and, of greatest importance
> to disability law, its symptoms are entirely
> subjective.  There are no laboratory tests
> for the presence or severity of fibromyalgia.
> The principal symptoms are "pain all over,"
> fatigue, disturbed sleep, stiffness, and--the
> only symptoms that discriminates between it
> and other diseases of a rheumatic character--
> multiple tender spots, more precisely 18
> fixed locations on the body (and the rule of
> thumb is that the patient must have at least
> 11 of them to be diagnosed as having
> fibroymalgia) that when pressed firmly cause
> the patient to flinch. . . . Some people may
> have such a severe case of fibromyalgia as to
> be disabled from working (citations omitted),
> but most do not.

78 F.3d at 306-07.  In a recent case from the Western District of Pennsylvania, the Court reiterated that fibromyalgia is an elusive problem which poses special circumstances in the social security arena. *Burns v. Comm'r of Soc. Sec.*, Civ. A. No. 14-1485, 2016 WL 344729, at *4 (W.D. Pa. January 28, 2016).  *Burns* specifically noted that "the credibility of a claimant's testimony is paramount when evaluating whether a claimant's fibromyalgia impairment is disabling" because of the subjectivity of the symptoms.  *Id.* (citing *Singleton v. Astrue*, 542 F. Supp. 2d 367, 378 (D. Del. 2008)).  The court further explained that

> "great weight must be given to a claimant's
> testimony regarding her subjective pain,
> especially when that testimony is supported
> by competent medical evidence." *Lintz v.
> Astrue*, Civ. Action No. 08-424, 2009 WL
> 1310646, at *7 (W.D. Pa. 2009) (citing
> *Chrupcala v. Heckler*, 829 F.2d 1269, 1276
> n.10 (3d Cir. 1997)).  Moreover, the reports
> prepared by doctors treating a claimant with

20

> fibromyalgia are particularly significant
> and, of course, subject to the "Treating
> Physician Doctrine," which prescribes that
> great weight should be given to the opinion
> of a physician who has had the opportunity to
> continually observe the patient over a
> prolonged period of time. *Id.* (internal
> citations omitted); *Perl v. Barhart*, Civ.
> Action No. 03-4580, 2005 WL 579879, at *3
> (E.D. Pa. Mar. 10, 2005); *Morales v. Apfel*,
> 225 F.3d 310, 317 (3d Cir. 2000). . . . "Even
> in fibromyalgia cases, the ALJ must compare
> the objective evidence and the subjective
> complaints and is permitted to reject
> plaintiff's subjective testimony so long as
> he provides a sufficient explanation for
> doing so." *Nocks v. Astrue*, 626 F. Supp. 2d
> 431, 446 (D. Del. 2009).  Accordingly, when
> assessing a complainant's symptoms of
> fibromyalgia, an ALJ must consider whether
> the record reveals clinical documentation of
> the complainant's symptoms and whether
> diagnosing physicians reported on the
> severity of the condition. *Singleton v.
> Astrue*, 542 F. Supp. 2d at 378; see also SSR
> 12-2p (evaluation of fibromyalgia).

2016 WL 344729, at *4.  *Perl* noted that the "presumption of

deference to the testimony of a claimant and the reports of his

treating doctors, barring contrary evidence, is particularly

significant when the alleged disability concerns a diagnosis of

fibromyalgia."  2005 WL 579879, at *3.

**A.**   ***Treating Physician's Opinion***

Plaintiff first asserts substantial evidence does not support

the ALJ's rejection of Plaintiff's treating physician, Thomas

Wallace, M.D.  (Doc. 11 at 6.)  Defendant responds that ALJ Wolfe

reasonably considered Dr. Wallace's opinion.  (Doc. 12 at 13.)  The

Court concludes that this claimed error is cause for remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)).  Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[2]  "A cardinal principle

---

[2] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)). As noted above, the presumption of deference to the reports of

and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

treating doctors, "barring contrary evidence, is particularly significant when the alleged disability concerns a diagnosis of fibromyalgia."  *Perl*, 2005 WL 579879, at *3.

As set out above, CRNP Ficks and Dr. Wallace opined that Plaintiff could lift up to twenty pounds, she could stand, walk and sit for an hour or less (cumulative in an eight-hour day), she had to avoid repetitive pushing and pulling and repetitive hand motions, she had to avoid squatting, climbing, twisting, carrying, pushing and pulling, she would require unscheduled breaks during an eight-hour workday, and she would likely be absent from work more than two days per month.  (R. 333, 365.)

Here the ALJ rejected the Physical Capacity Evaluation originally authored by CRNP Ficks on April 1, 2014, and later affirmed by Dr. Wallace on July 11, 2014.  (R. 333, 365.)

> This assessment would allow less than sedentary work with standing/walking for one hour or less and sitting for one hour or less.  This means the claimant must lay down for 22 hours in a day.  The physical examination findings by this nurse practitioner were within normal limits.  Also in May 2014, the same provider indicates that the claimant can work with limitations and it would be good for her to get out of the house.  This opinion cannot be accorded any weight as it is inconsistent with the physical findings made by the same practitioner (Exhibit 10F/p. 29 [R. 362]).
>
> . . . [T]he same physical capacities evaluation . . . [was] signed by Dr. Wallace on July 11, 2014.  No weight is given to this opinion because the examinations after October 2013 showed no trigger points and

24

were essentially normal physically.

(R. 25.)

Emphasizing the need for unscheduled breaks and anticipated absenteeism established in the opinion and the VE's testimony that the projected restrictions would preclude competitive employment, Plaintiff maintains these aspects of the assessment are completely consistent with Dr. Wallace's multiple references in the medical records indicating Plaintiff has good days and bad days and Plaintiff's testimony that, on bad days, she spends the day on the couch or in bed.  (Doc. 11 at 6-7 (citing R. 73).)  Plaintiff also contends that the many references in Dr. Wallace's records to "exquisitely tender triggerpoints, pain at multiple sites, stiffness, fatigue, sleep disturbance, swelling, and weakness provide clinical support for the limitations endorsed by Dr. Wallace."  (*Id.* at 7.)  Plaintiff posits that the limitations pertain to her capabilities on bad days and the absence of triggerpoint notations is not significant in that the doctor would have no reason to continually check triggerpoints after definitively establishing the diagnosis of fibromyalgia.  (*Id.* at 8.)  Finally, Plaintiff asserts the ALJ erred because she did not base her rejection of the opinion on any contrary medical opinion, and she could not have because there is none in the record.  (*Id.*)

Certainly the record reveals clinical documentation of Plaintiff's symptoms and her treating physician reported on the

25

severity of her condition, important factors in evaluating a case involving fibromyalgia. *Singleton*, 542 F. Supp. 2d at 378; SSR 12-2p. Significantly, normal examination findings are of little relevance in reviewing a claim based on pain and fatigue from fibromyalgia. *See*, *e.g.*, *Smith*, 2009 WL 2762687, at *4 (where treating physician had diagnosed fibromyalgia, normal examination findings did not constitute substantial evidence supporting ALJ's denial of claim); *see also Yerk v. Astrue*, Civ. A. No. 2:07-CV-1601, 2009 WL 195991, at *9 (W.D. Pa. Jan. 26, 2009) (objective "substantially normal findings" in no way inconsistent with diagnosed fibromyalgia). Thus, examination findings within normal limits are inconsequential, as are ALJ Wolfe's references to the lack of sensory or gait deficits and range of motion deficits, as reasons to discount assessments made by Dr. Wallace regarding Plaintiff's limited work abilities. (R. 25.)

Though not explicitly stated in ALJ Wolfe's assessment of the Physical Capacity Evaluation, the lack of reference to triggerpoints on the day CRNP Ficks completed the evaluation cannot be considered substantial evidence supporting her rejection of the opinion for several reasons, including that asserted by Plaintiff--once an incurable condition has been conclusively diagnosed, it is plausible that the signatory manifestations of the condition would not be checked or reiterated at every office visit. Here there is no debate about whether Plaintiff has fibromyalgia and that it has

26

been considered severe at times by both her primary care treating physician and a specialist in the relevant field, *see Sarchet*, 78 F.3d at 307, rheumatologist Dr. Shenberger.  (R. 236, 309.)

ALJ Wolfe's failure to acknowledge the unique circumstances presented by a claimant alleging disability based on fibromyalgia and citation to irrelevant findings undermine the validity of her assessments.  *See*, *e.g.*, *Henderson v. Astrue*, 887 F. Supp. 2d 617, 636 (W.D. Pa. Aug. 16, 2012).  Furthermore, in rejecting the Evaluation, the ALJ fails to take into account longitudinal treatment of Plaintiff by CRNP Ficks and Dr. Wallace and the fact that there is no cure for the condition.  No treating source indicates that Plaintiff's flare ups and/or claimed limitations when they occur are manufactured.  The record is devoid of any suggestion that Plaintiff is a malingerer.  The record is also replete with evidence from Plaintiff's primary care physician and specialist that Plaintiff's flare ups were not easily managed. (*See, e.g.,* R. 311, 358.)

ALJ Wolfe's reference to the fact that CRNP Ficks indicated that Plaintiff could work with limitations in May 2014 (R. 25) does not present the conflict inferred in that ability to do some work does not equate with the ability to engage in substantial gainful activity which is the ability to sustain the work activity "through continuous attendance in a regular workweek"--it means eight hours per day for five days a week or an equivalent schedule.  *Kangas v.*

27

*Bowen*, 823 F.2d 775, 778 (3d Cir. 1987); *Conley v. Colvin*, Civ. A. No. 15-722-RGA-MPT, 2016 WL 3436435, at *11 (D. Del. June 20, 2016). Without more, CRNP Ficks' April 1, 2014, assessment that Plaintiff was "able to work only with limitations" followed by her opinion that Plaintiff would require unscheduled breaks and be absent in excess of two days per month (opinions shared by Dr. Wallace (R. 365)), is neither internally inconsistent with the limitations set out in the Evaluation (R. 365) nor contradictory to CRNP Ficks' May 1, 2014, discussion with Plaintiff where she indicated that Plaintiff could work but she had limitations and that getting out of the house would probably help her depression symptoms (R. 362).

For all of these reasons, the Court cannot conclude that the ALJ's rejection of the only opinion of record is supported by substantial evidence, particularly since ALJ Wolfe cites no specific and relevant contrary evidence as required in the rejection of a treating physician's opinion in the context presented here.

## B.   *Credibility*

Plaintiff asserts the ALJ erred in her credibility determination in that it does not comport with the relevant Social Security Rulings. (Doc. 11 at 8-9 (citing SSR 16-3p).) Defendant maintains the ALJ provided adequate explanation for her credibility finding. (Doc. 12 at 18.) The Court concludes the ALJ failed to

properly assess Plaintiff's credibility.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'" *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)). "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. "One strong indication of the credibility of an

individual's statements is their consistency, both internally and with other information in the case record."  SSR 96-7p.

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. § 404.1529.  First, symptoms such as pain, shortness of breath, and fatigue will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work.  *Id.*  In so doing, the medical evidence of record is considered along with the claimant's statements.  *Id.*

The regulations also provide that factors which will be considered relevant to symptoms such as pain are the following: activities of daily living; the location, duration, frequency and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment received other than medication intended to relieve pain or other symptoms; other measures used for pain/symptom relief; and other factors concerning functional limitations and restrictions due to

pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i-vii),
416.929(c)(3)(i-vii).

The credibility of a claimant alleging disability based on
fibromyalgia takes on special significance in that the symptoms are
necessarily subjective and it would be error for an ALJ to require
objective findings to support a claimant's reported symptoms.  *See*,
e.g., *Foley v. Barnhart*, 432 F. Supp. 2d 465, 476 (M.D. Pa. 2005).
As set out previously, *Singleton* noted two additional factors which
may be considered in evaluating credibility in the fibromyalgia
context: "(1) whether the record contains a detailed clinical
documentation of the claimant's symptoms, and (2) whether the
physicians who diagnosed the claimant with fibromyalgia reported on
the severity of his or her condition."  542 F. Supp. 2d at 378.

Here the Court need not delve into a detailed analysis of the
ALJ's credibility determination, primarily because the ALJ's
assessment that Plaintiff's "statements concerning the limiting
effects of [her] symptoms are not entirely credible for the reasons
explained in this decision" (R. 24) is insufficient, particularly
in the context of a disability claim based on fibromyalgia and an
improper evaluation of medical opinion evidence.  Further, the
review of evidence set out in the Background section of this
Memorandum shows that the record contains detailed clinical
documentation of Plaintiff's symptoms and, as noted above, both Dr.
Wallace (*see*, *e.g.*, R. 237, 553, 358) and Dr. Stenberger (R. 309)

reported on the severity of her condition.  *See* 542 F. Supp. 2d at 378.  With a long and solid work history prior to her fibromyalgia diagnosis, *Dobrowolsky*, 606 F.2d at 409 (plaintiff with a long work history may be entitled to consideration of that history in the assessment of his credibility), and no conflict concerning her testimony about the symptoms related to her condition on bad days (*see*, *e.g.*, R. 65-66, 73, 74), reports to her treating physician/CRNP (*see*, *e.g.*, R. 236, 238, 246), and the Physical Capacity Evaluation construed as an estimation of Plaintiff's capabilities on bad days (R. 333), a reevaluation of Plaintiff's credibility is warranted.

## C.    *Substantial Gainful Activity*

Plaintiff contends that the ALJ erred in holding that Plaintiff engaged in substantial gainful activity ("SGA") during the months of March and April 2013 because she earned less than the relevant maximum earnings figure during those months and there is no authority for the ALJ's proration of her part-time work earnings.  (Doc. 11 at 9-10 (citing R. 15, 244).)  Defendant responds that this alleged error had no impact on the ALJ's final decision because she subsequently found a continuous twelve-month period when Plaintiff did not engage in SGA and continued through the sequential evaluation process.  (Doc. 12 at 20-21 (citing R. 15-16, 25, 26).)  Defendant is correct that Plaintiff has not shown that the alleged error is harmful.  (*Id.* at 20 (citing

*Shineski v. Sanders*, 556 U.S. 396, 409 (2009)).)  Therefore, reconsideration of the issue is not required but may be clarified upon remand.

### D.   Award of Benefits

Plaintiff urges that the Court award benefits in this case rather than remand to the Social Security Administration.  (Doc. 11 at 10.)  However, the Court concludes the better course of action is to remand the matter for further action and consideration.

The decision to award benefits "'should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits.'"  *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 358 (3d Cir. 2008) (quoting *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984)). *Brownawell* added that "[s]uch a decision is especially appropriate when the disability determination process has been delayed due to factors beyond the claimant's control."  *Id.* (citing *Podedworny*, 745 F.2d at 221; *Morales*, 225 F.3d at 320).

Here there has been no delay beyond the ordinary very long process of applying for benefits and appealing an initial unfavorable decision.  Further, to the extent records from Dr. Wallace and CRNP Ficks can be characterized as ambiguous, the disability determination is best based on further development of the record.

An ALJ has a duty to develop a full and fair record in Social Security cases. *Boone v. Barnhart*, 353 F.3d 203, 208 n.11 (3d Cir. 2004). Although the duty does not relieve the claimant of her burden of proof, *Hess v. Sec'y of Health, Education, and Welfare*, 497 F.2d 837, 840 (3d Cir. 2005), an ALJ "must secure relevant information regarding a claimant's entitlement to benefits," *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995). It is "incumbent upon the [ALJ] to secure additional evidence needed to make a sound determination." *Ferguson v. Schweiker*, 765 F.2d 31, 36 (3d Cir. 1985). The requirement does not necessarily come into play where "there was sufficient evidence in the medical records for the ALJ to make her decision." *Moody v. Barnhart*, 114 F. App'x 495, 501 (3d Cir. 2004) (not precedential); *see also Griffin v. Commissioner of Social Security*, 303 F. App'x 886, 890 n.5 (3d Cir. 2009) (not precedential). If the record is inadequate for proper evaluation of the evidence, the ALJ's duty to develop the record is triggered. *See*, *e.g.*, *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). "Ultimately, the question is whether the administrative record has been adequately developed under the circumstances to provide a substantial basis for the decision." *Yerk*, 2009 WL 185991, at *8 (citing *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).

In certain circumstances, the duty to develop the record, may entail a duty to recontact a medical source to obtain additional

34

information, such as when the source's report "contains a conflict or ambiguity that must be resolved," "does not contain all the necessary information, or does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing 20 C.F.R. § 416.912(e)(1) and 20 C.F.R. § 404.1512(e)(1)).[3] It is the *inadequacy* of the record that triggers the duty. 529 F.3d at 205. SSR 96-5p specifically states that the agency will "make every reasonable effort to recontact [treating sources] for clarification when they provide opinions on issues reserved for the Commissioner and the bases for such opinions are not clear." SSR 96-5p, 1996 WL 3741843, at *2 (1996) (listing examples of such issues).

Here the Court has determined that the ALJ did not properly evaluate the medical opinion evidence or Plaintiff's credibility. As discussed above, ALJ Wolfe discounted the only formal medical opinion of record without citing contradictory evidence and with references and inferences of conflict which are questionable (*see* R. 25). She completely discounted certain other record evidence concerning the treating physician's notations about Plaintiff's ability to work based on her assessment that Dr. Wallace "appears"

_____

[3] As of March 26, 2012, the regulations governing an ALJ's duty to recontact a medical source changed. In the case where the agency determines there is insufficiency or inconsistency in the record and the agency cannot reach a conclusion about whether the claimant is disabled , 20 C.F.R. §404.1520b provides that resolution may include recontacting the treating physician or other medical source, requesting additional records, requesting a consultative examination or asking the claimant or others for more information. 20 C.F.R. §404.1520b(c)(1)-(4).

to provide the limitations based on Plaintiff's subjective reporting.[4]   (*Id.*)   Because of ALJ Wolfe's perceived ambiguity or inconsistency regarding treating source records and opinions, the best course of action in this case is to remand the matter with direction to recontact Dr. Wallace for clarification of the Physical Capacity Evaluation (R. 333), his bases for the limitations set out in his notes, and the significance of a lack triggerpoint notation at some office visits.   With this additional information, Plaintiff's RFC should be reevaluated and her credibility reassessed in the context of the unique difficulties attendant to an analysis of disability based on fibromyalgia.

### V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly granted and this matter is remanded to the Acting Commissioner for further consideration.   An appropriate Order is filed simultaneously with this action.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


DATED: September 7, 2016

---

[4] ALJ Wolfe reviewed notes from Dr. Wallace indicating that Plaintiff had work limitations, some of which were found in "complaints" section of his notes and some in the "assessment/plan" section.  (R. 25.)  She gave no weight to these opinions, stating "[i]t appears that the doctor is providing the limitations based upon the statements of the claimant as to how much time, or not time she can work."  (*Id.*)  Such an assumption is problematic when considered in the context of the nature of fibromyalgia as discussed in the text.